## BARRIERE & CO. *v.* SAMORY.

This case presents a question of facts merely. The point being whether the endorser of a note was not discharged in consequence of want of due diligence on the part of the holder to obtain payment from the maker.

APPEAL from the Fifth District Court of New Orleans, *Augustin*, J. *L. Janin* and *S. L. Johnson*, for plaintiffs.   *C. Maurian*, for defendant.

SLIDELL, C. J. The District Judge was of opinion that reasonable diligence had been used to find the maker, and we do not feel prepared to dissent from his conclusions. We refer to the opinion prepared by him[*], and also to the following portion of the evidence :

The note was received by the notary as usual after the closing of the bank. The notary's clerk says : I went in the first place to Mr. *Feste's* late store in Chartres street, and found it in the occupation of other parties. I enquired of the occupants of the store where *Feste* resided and gained no information. I then went to his late domicil in Rampart street, and made enquiry there for Mr. *Feste*, and I was informed by a lady that he had removed from that house some three months previously, and that she did not know where I could find him. I then made enquiry of a Mr. *Locq*, who kept a carriage repository in the same street and near to *Feste's* late domicil, and he told me that he believed *Feste* lived somewhere in the third municipality, but could not tell me where, and that he believed that *Feste* and his family were then out of the city and over the lake. I then went to the store of Mr. *Petitpain*, the first endorser, and showed him the note, told him the endeavors I had made to find Mr. *Feste*, and he told me to protest the note. I did not ask Mr. *Petitpain* where Mr. *Feste* lived, but generally when I call upon a first endorser, I state the steps I have taken to find the drawer. I take it for granted that that is as much as if I had asked where the drawer resided. The call on *Petitpain*, by which the notary's deputy closed his enquiries, was about 8 o'clock in the evening. He says : I did not call on *Samory*, because I had labored for three or four

<hr/>

[*] From the allusion made by the Chief Justice to the opinion of the District Court, it has been thought proper to insert it.—REP.

The defendant being sued as endorser, has raised the technical objection that no demand had been made to the maker of the note at maturity, and therefore that he is discharged.

It appears that the notary's deputy, *Barry*, on the day of maturity after three o'clock, went in search of the maker of the note, *Victor Feste*, and following the indications in the directory for 1858, went first to Rampart street near Toulouse, and upon enquiry in the vicinity, was told that *Feste* had removed since the beginning of June. Then *Barry* went to No. 22 Chartres street, the former place of business of *Feste*, and there did not find him, then he went to the office of the holders of the note, and there was told that *Feste* had removed somewhere about the Lower Cotton Press. Then *Barry* applied to the first endorser, *Petitpain*, who did not tell him where *Feste* resided, but told him to protest the note ; *Barry* says that it was after (8) eight o'clock at night when he went to *Petitpain*.

The doctrine is well established that due diligence to find the maker of the note will excuse the want of presentation and demand.

In this case the difficulty in finding the maker was creat:d by his own act, the breaking up of his business and the late removal of his residence.

The kind of diligence used by the notary, is not certainly of that character which would justify a return of *non est inventus* from an officer who has whole days and weeks to institute his search and to make his return, but for the notary who is so limited in point of time, and who has employed four hours in the search of the maker of a note and made enquiries as proved in the evidence, the court must consider that the diligence of that notary, although unsuccessful, covers fully the legal ground, and excuses the want of demand.

The evasive answer given by *Petitpain* who is *Feste's* father-in-law, may have impressed the notary with the idea that *Feste* was concealing himself from his creditors, considering the fruitless search which he had made for him during the afternoon.

It is therefore adjudged and decreed, that plaintiff recover from *C. Samory* four thousand dollars with costs of protest, interest from the day of protest and costs of suit.

hours to find the whereabouts of *Feste*, and that *Petitpain* had told me to pro-
test the note, and it was then after 8 o'clock in the evening.

The protest was during the worst part of the epidemic of last year, and
there was a considerable number of persons absent from the city with their
families. There was a suspension of all ordinary business that was not of an
urgent character.

A deputy Sheriff who had been employed to serve process on *Feste*, states
various unsuccessful enquiries he had made and adds, "It was more than a
week from the time I was looking for *Feste* until I served the papers on him in
the Sheriff's office."

Another witness says: In the beginning of June, I was book-keeper of Mr.
*Moreau*, and had an account against Mr. *Feste*. I went to the late domicil of Mr.
*Feste*, on Rampart street, and was informed by a servant that *Feste* had re-
moved from there, but could not tell me where. I then applied at the livery
stable next door from *E. Rillieux, Jr.*, he replied that he did not know where
*Feste* resided, but he thought it was in the third district somewhere. I return-
ed there some days after this, but could not ascertain his residence. I went
into the third district, in St. Ferdinand street and adjoining streets, but could
not ascertain the residence of *Feste*.

A Sheriff's officer says: I served papers on *Feste* in the alley-way of the
court-house. They had been in the hands of an officer some days without
being able to serve them.

It was admitted at the trial, that in the directory for the year 1853, the resi-
dence of *Victor Feste* is put down as on Rampart street, between St. Louis
and Toulouse streets, and that his store was at No. 22 Chartres street. Also,
that in the directory published in January, 1854, his residence is given as be-
ing at the corner of Port and Casacalvo streets.

Judgment affirmed with costs.

VOORHIES, J., BUCHANAN, J., and SPOFFORD, J., concurring.

OGDEN, J., dissenting. I find myself unable to concur with my brother
Judges in the conclusion to which they have arrived, that there was due dili-
gence on the part of the holder of the note to find the residence of the maker.

It has been always held that due diligence to obtain payment from the
maker, is a condition precedent, on which the liability of the endorser depends.
In the case of *Magruder* v. *The Bank of Georgetown*, 3 Peters' R., the Su-
preme Court of the United States held that the endorser having become ad-
ministrator of the drawer's estate, who had died before the maturity of the
note, did not relieve the holder from the obligation of demanding payment of
the note in order to charge the endorser.

*Samory* is sued as second endorser of *Feste's* note. The holders of the note,
the maker and the endorser all reside in New Orleans. *Feste*, the maker, was
a married man, a house-keeper, and had been for eighteen years well known
among the store-keepers on Chartres street. At the time the note was protest-
ed, he was living in a rented house at the corner of Port and Casacalvo streets
in the third district. There is no evidence that he was absent from the city at
the time. The agent of the holders of the note were in the city at the time,
and was called upon by the clerk of the notary who was charged with pre-
senting the note and demanding payment for information as to *Feste's* residence.
This agent was a witness on the trial and he states that he told the clerk that

*Feste* resided somewhere in the third district—he says he thinks he told him he would endeavor to find out *Feste's* residence and that the clerk replied he was going somewhere else to enquire, or that he was going to *Petitpain's* to enquire. The clerk did go to *Petitpain's*, but he states in his testimony that he did not ask *Petitpain* where *Feste* lived. In the testimony of this witness given on a previous trial of a suit on the same note against *Petitpain*, the first endorser, he said that he did ask Mr. *Petitpain* where *Feste* resided, and that he answered him to protest the note. In giving his testimony on that trial of this case, he says in one part of his testimony, that he cannot recollect whether he made a demand of *Petitpain* for *Feste's* residence. He uses this language: "generally when I call on a first endorser, I state the steps I have taken to find the drawer, I take it for granted, that that is as much as if I had asked where the drawer lived." *Petitpain* was the father-in-law of *Feste*, and the defendant, *Samory*, was *Petitpain's* brother-in-law, and had his store near that of *Petitpain*.

With the fact conceded that *Feste* had a residence in the city, and that the notary's clerk called at his father-in-law's store for information as to *Feste's* residence, how is it to be accounted for that he went away without gaining that information or making any further attempt to find the residence. The only explanation of which it is susceptible, is that furnished by himself, that Mr. *Petitpain* told him to protest the note. In this correction, he says: "that after having done every thing he had stated, and Mr. *Petitpain* telling him to protest the note, caused him to cease making any further enquiry for the drawer. This witness was examined several times and with great minuteness and particularity. The diligence used by him consists according to his statement in his enquiring at *Feste's* late store, at his former residence on Rampart street, and having made enquiries at a coach maker's, and at a livery stable in the immediate vicinity of the former residence of *Feste*. At one of these places he was informed that *Feste* resided in the third municipality, and yet he did not go into the third municipality.

By the agent of the holder of the note, he was also informed that *Feste's* residence was in the third municipality. To constitute due diligence which must always depend on the particular circumstances of the case, I think it was the duty of the agent of the holders of the note on being applied to, for information as to *Feste's* residence, to have made some efforts to ascertain it, and that it was the duty of the notary's clerk when he went to *Petitpain*, to have endeavored to find out from him where his son-in-law's residence was, and to have gone into the third municipality where he had been informed *Feste* lived and there made enquiries for him at public places. The proposition of the appellant's counsel, that with proper diligence and enquiry, the presentment and demand of payment could have been made at *Feste's* residence is, I think, fully sustained by the evidence. It is not only shown that he had a residence in the city, which must have been known to many persons living in the third municipality, but it is shown that process from the courts had been served on him, at that domicil. I cannot consider as of much weight the testimony of one of the officers of the court, that he had tried for some time to find *Feste's* residence without succeeding, because this witness does not state the means used by him to find the residence, and it is therefore impossible to judge whether he used due diligence. The certificate of the notary after stating that he had made careful search and diligent enquiry for the drawer, and that he could not find

him or his present domicil, goes on to say that it being also the wish of the first endorser that the same should be protested, he had accordingly protested the note. I am satisfied from this certificate and the evidence in connection with it, that the notary's clerk did not endeavor to ascertain from *Petitpain* where *Feste* resided, and did not go into the third municipality where he knew *Feste* resided, because *Petitpain*, the first endorser, told him to protest the note, and although as to *Petitpain*, this was sufficient to relieve the notary from the necessity of making a demand of payment from the maker, it did not have this effect in regard to the defendant, *Samory*, who, I think, is released from liability as endorser, on account of the *laches* imputable to the holders of the note.

The judgment of the court below ought in my opinion to be reversed and one rendered for the defendant.